M. J. CAVANAUGH *et al. vs.* THE MAYOR AND ALDERMEN
OF PAWTUCKET.

PROVIDENCE—JUNE 12, 1901.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *Mandamus. Public Officers. Demand and Refusal.*

Where the proceeding has relation to private rights or interests, previously
to the making of an application to the court for a writ of *mandamus* to
command the performance of any particular act an express and distinct
demand to perform it must have been made by the prosecutor to the
defendant, who must have refused to comply with such demand either
in direct terms or by conduct from which a refusal will be conclusively
implied.

*Semble,* where a rule of a board of health provided that no person should
remove the dead body of any animal or any diseased or putrid meat
through the streets of a city, unless such person should have been duly
authorized so to do by the board of health, and the board of health
advertised for proposals for the exclusive privilege for a term of five
years of removing dead animals and such diseased meat as might be
ordered by the superintendent of health, the proper form of document
called for under the advertisement would be an exclusive license and
not a contract.

MANDAMUS.    The facts are fully stated in the opinion.
Petition dismissed.

ROGERS, J.    This is a petition for a writ of *mandamus* to
compel the mayor and board of aldermen of the city of Paw-
tucket to execute a contract with the petitioners forthwith,
granting the latter the exclusive privilege, for a term of five
years, of removing dead animals and such diseased and putrid
meat as may be ordered by the superintendent of health from
the city of Pawtucket, or forthwith to issue an order to the
city clerk of said city to issue to the petitioners a license in
the premises for the privilege aforesaid.

The facts that appear in the petition, or from the records
of the board of aldermen, in regard to which there is no dis-
pute, are as follows, viz.:

On February 6, 1901, the said board of aldermen adopted
the following as rule 14 of the board of health, the board of

aldermen constituting the board of health (Ord. of Pawtucket, cap. 36, § 1, p. 135), viz.:—

"No person shall bury the carcass of any dead animal or any diseased or putrid meat within the limits of this city. And no person shall remove the dead body of any animal or any diseased or putrid meat through the streets of this city unless such person shall have been duly authorized so to do by this board of health.   It shall be the duty of every policeman or other person knowing of the presence of the dead body of any animal or of any diseased or putrid meat within the limits of this city to notify the board of health of the same as soon as may be."

A subsequent rule provided that any person violating said rule shall be liable to a fine of not more than $20.

At a meeting of said board of aldermen on February 13, 1901, the clerk was ordered to advertise for bids for the exclusive privilege of removing dead animals, diseased or putrid meat condemned by the superintendent of health, for a term of five years; bids to be filed with the city clerk on or before March 6th, at 8 o'clock P. M.

In conformity with the foregoing vote the following advertisement was published, viz.:

## "CITY OF PAWTUCKET.

## "REMOVAL OF DEAD ANIMALS.

"The board of aldermen of the city of Pawtucket invite sealed proposals for the exclusive privilege for a term of five years of removing dead animals and such diseased and putrid meat as may be ordered by the superintendent of health from the city of Pawtucket.   Bids must be filed with the city clerk before 8 o'clock P. M., Wednesday, March 6th, 1901.   A bond in such amount as the board of aldermen may direct will be required of the successful bidder.   The board of aldermen reserves the right to reject any and all bids.

"SAMUEL H. ROBERTS,
"*City Clerk.*"

At the meeting of the board of aldermen on March 6th, 1901, no quorum was present, and at a special meeting held March 7th 1901, the bids were opened and the matter was laid on the table; but at a meeting held March 20, 1901, it appearing that two bids had been made in response to said advertisement, one for $500, and the other for $1,500 made by these petitioners, it was voted that the contract be awarded to the highest bidder; a bond of $5,000 accompanied the successful bid, which was apparently satisfactory, no objection appearing to have been made thereto.

On March 8th, 1901, being the day after the said bids had been opened, but before the board of aldermen had acted thereon, the petitioners, through their attorney, applied orally to the city clerk and the city treasurer and requested a license in the premises, or the privilege of signing any contract required, and then and there offered to pay for the same; but said officials declined to receive any money therefor, the city clerk stating that he did not know whether said privilege was to be shown by a license signed by him as city clerk, or by a contract signed by the proper city officers, and further, that he did not know whether the full amount of $1,500 was to be all paid at once in a single payment, or in yearly installments.

On March 27th, 1901, at the next subsequent meeting of the board of aldermen to that at which it was voted to award the contract to the petitioners, the following communication was presented on behalf of the petitioners, viz.:

" *To the Honorable Board of Aldermen of the City of Pawtucket:*

. "GENTLEMEN: At your last meeting this Board voted to accept the bid of William H. Place, Theodore S. Barnes, and Michael J. Cavanaugh for the privilege of removing through the streets of this city the carcasses of dead animals, &c., they being the highest bidder for the exclusive privilege under the advertisement ordered by this Board. Since the acceptance of their said bid the parties aforesaid have requested a form of license, or certificate, setting forth the

privilege granted them, and they have presented a good and sufficient bond to faithfully perform their obligations and to hold this city harmless and have offered to pay for the same. But the city clerk informs me as their attorney, that he does not know what form of document he is to give them, nor does he know whether the sum to be paid for said privilege is to be paid in full for the whole term of five years or in yearly payments.

" Your honorable body is therefore requested to make it plain as to whether said clerk shall prepare a form of permit or license or if he shall prepare a form of contract ; and also whether the licensed party shall pay for the full term or yearly.

" Respectfully,

"HUGH J. CARROLL,

" Attorney for Place, Barnes & Cavanaugh."

The foregoing communication, as appears by the board's record, was received, read, and referred to the city solicitor. At the meeting of the board of aldermen on April 17th, 1901, the city solicitor reported verbally as his opinion that the full sum of $1,500 must be paid by the petitioners at once in a single payment and not by yearly installments, but that it was for the board of aldermen to say whether a license should be granted ; whereupon it was voted to refer the matter to the board of health.

(1)    We do not understand that there is any question as to the correctness of the facts as above set forth ; but, inasmuch as nowhere in the petition is it specifically alleged that the respondents have refused to sign a contract or to cause one to be signed, or to issue a license, as now sought to be enforced by a writ of mandamus, such refusal, if any there be, must be inferred, and the following passages from the petition are evidently intended as a substitute for an allegation of a demand for and a refusal of the thing sought.   The following are the passages referred to :

" VIII.   And your petitioners show that upon the making of said report, the said Board of Aldermen, without any

reason, and for no purpose but to harass, hinder, and delay the petitioners, refused to decide whether there should be a license or a contract in the premises, but wilfully and wrongly then and there voted to refer said matters to the board of health of said city, as appears by a copy of said vote here-with filed.

"IX. And your petitioners aver that they have ever stood ready to execute any contract required in the premises, or to accept a license, and have been and now are ready to pay for the same upon the terms reported by said city solicitor. That they have been delayed and harassed unnecessarily and illegally in the premises by said Board of Aldermen and that said delay has not been for any good or reasonable purpose, but merely wilful and wanton and for the purpose of depriving the petitioners of their rights under said advertisement and bid and vote accepting said bid, and to prevent them from enjoying the emoluments of said privilege. That your petitioners have gone to great expense in preparing for said business and that they are daily losing large sums of money by said wilful, wanton and malicious delay. That said Board of Health has nothing to do with the question as to whether a license or a contract is proper in the premises, and that this is well known to said Board of Aldermen."

The petition also alleges that the mayor and board of aldermen have the right and that it is their duty to execute a contract with the petitioners in the premises or to order the city clerk of said city to issue a license in the premises to the petitioners, and prays for a writ of *mandamus* commanding the performance thereof.

The only proofs presented is a certified copy of the records of the board of aldermen, and the petition for the writ which is sworn to by the petitioners' attorney.

In *Mauran, Adjutant-General, &c., v. Smith, Governor, &c.,* 8 R. I. 192, 222, the Supreme Court of this State, through Durfee, J., delivering the opinion, used this language: "But though we think the application ought to be dismissed for want of jurisdiction, we deem it not improper to say that, even if we had jurisdiction, we should not deem this a case

for granting the writ, at least in a peremptory form.   A writer on the law of *mandamus* says : ' It is an imperative rule of the law of *mandamus*, that previously to the making of the application to the court for a writ to command the performance of any particular act, an express and distinct demand or request to perform it must have been made by the prosecutor to the defendant, who must have refused to comply with such demand, either in direct terms, or by conduct from which a refusal will be conclusively implied.' " Citing Tapping on Mandamus, 282 ; *People* v. *Romero*, 18 Cal. 89 ; *Rex* v. *Brecknock*, 3 A. & E. 217, and other cases. Durfee, J., then proceeds as follows : "Now in this case there has been no express refusal, and no conduct which is conclusively equivalent to a refusal.   The defendant sets forth in his answer, that when requested to perform the duty which we are asked to enforce, he replied that he had the matter under consideration.   But the relator claims that to hold the matter under consideration for twenty-one days prior to this application, was a virtual refusal. . . . We are not ready to adopt that conclusion, and could not, therefore, in the present aspect of the case, even if we thought we had jurisdiction, consent to grant the writ—certainly not in a peremptory form."

The general rule is admitted to be that a demand and refusal is necessary ; that is, a demand must be made on the proper officer to perform the duty desired before a writ of *mandamus* will be issued to compel him to discharge such duty.   14 A. & E. Enc. of Law (1st ed.), 107 ; Merrill on Mandamus, § 222.   In the volumes just cited the subject is treated very fully, with its exceptions, and very many cases are cited.

In *The State, ex rel. Mitchell* v. *York Co.*, 8 Neb. 92, 94, the Supreme Court of Nebraska, through Maxwell, C. J., says : " The writ is never granted in anticipation of an omission of duty, however strong the presumption may be that the persons against whom the writ is sought will refuse to perform their duty when the proper time arrives."

In *The King* v. *Brecknock, &c., Canal Co.*, 3 A. & E. 217,

223, the King's Bench, by Denman, C. J., says : "The parties making the application do not state anything, subsequent to the resolution in 1833, which carries the refusal of performance farther than a demand of indemnity for the company in case of their doing the works. We cannot grant a *mandamus* unless there has been a direct refusal; and here, I think, there has not. It is not indeed necessary that the word 'refuse,' or any equivalent of it, should be used; but there should be enough to show that the party withholds compliance, and distinctly determines not to do what is required. The question is, as in a case which was lately before us respecting payment of taxes (*Rex* v. *Ford*, 2 A. & E. 588), whether the party had done what the court distinctly sees to be equivalent to a refusal. Here I cannot perceive that in the correspondence and conduct of the company. Their answer to the last application is, that they are ready to do the works if indemnified. That leaves the case short of the point to which it would have been brought if such an application had been made that any non performance afterwards must have amounted to a refusal. Messrs. Harford & Co. might have said, 'we desire a direct answer, and your not giving it will be considered a refusal.' A direct application would probably have led to a direct denial; and that, or something equivalent, should have taken place, to furnish ground for a *mandamus*."

In *The King* v. *The Wilts, &c., Canal Co.*, 3 A. & E. 477, 482, the King's Bench, through Denman, C. J., says : "There is no doubt that every proprietor has a right to inspect these documents. There is no particular officer to whom the care of them belongs; the committee have the power over them, and appoint officers in whose hands they remain. Where the applications to inspect these documents may occasion inconvenience, it is reasonable that the parties upon whom such demands are made, should be informed, *bona fide*, of the object of the request. Here the party applying goes to the officers, and afterwards to the committee, who say that they have never had such an application made, and must take time to consider it. That, I think, is reasonable, and no refusal.

The party should have applied to them again, so as to obtain an answer which might show that they had exercised their judgment on his demand.   Instead of doing so he goes again to gentlemen with whom he seems to be upon ill terms, and who do not appear to have been authorized by the committee to return him an answer, but who make a reply one is not surprised at.   It seems to me that this is no refusal by the committee.   They were the persons to whom the second application should have been made; and until they had refused upon such application there could be no ground for a *mandamus.*"

There is a class of cases, however, where no demand and refusal are required, constituting an exception to the rule, and this is well settled in *State, ex rel. Rice* v. *County Judge of Marshall County*, 7 Ia. 186, 202, which was *mandamus* to the county judge of Marshall county, requiring the said county judge to take to his assistance two justices of the peace of said county and recanvass the votes cast at an election on the question of relocating the county-seat of said county, and when so recanvassed that he declare the result in accordance with said vote.   In that case Woodbury, J., in delivering the opinion, *inter alia*, said : " It is stated that a demand must be made, and a refusal thereto.   Tap. on Mand. 382 ; *Chance* v. *Temple*, 1 Iowa, ·189.   This is true as the general rule, and it is more especially true where the proceeding has relation to private rights or interests, as will be observed by the subjects treated in Tap. on Mand., 84, 162, 163, marginal.   But it is manifest there are cases affecting public officers, or duties, where the idea of a literal demand and refusal does not have place, there being no one particularly empowered to demand, as it does not affect individual interests ; but the law—the official duty—is in the place of it, and omission or neglect is refusal. . And especially is this true when the respondent has done an act which he calls a performance, but which the law says is not such.

" The refusal is not necessarily a literal one.   Tapping says it must be either ' in direct terms, or by conduct from which a refusal can be conclusively implied,' Tap. 283 ; and on page

285 he says : ' It is not necessary that the word *refuse*, or any equivalent of it, should be used, but there should be enough, from the whole of the facts, to show to the court that, for some improper reason, compliance is withheld, and a distinct determination not to do what is required ; and instances are given in which acts have been construed to amount to a refusal.

" We cannot bring ourselves to think, that in case of public duty, like that at bar, in which the act to be done is well known, and would have been performed already, if the party did not intend not to do it ; and where it belongs to no one to request it, but it does belong to the defendant to do it, a formal demand or refusal is necessary.    It is clear that duty makes the demand, and omission is the refusal."

We are of the opinion that in the case at bar a demand and refusal was necessary, as the petitioners were particularly if not solely interested in the performance of the contract, it being for their benefit and affecting their pecuniary interests.    We draw no conclusive inference that the delay complained of is equivalent to a refusal.    On March 20th, 1901, the board accepted the petitioners' bid ; the latter made no demand of the board, but at the next meeting, on March 27, 1901, the petitioners presented a communication asking the board to make it plain whether a form of permit or license, or a contract, should be prepared, and whether the payment should be for the full term or yearly.    The board very naturally referred the matter to the city solicitor, which officer reported verbally to the board, on April 17, 1901, that the full sum of $1,500 should be paid ; but instead of giving the board any advice as to the further manner of proceeding, as inquired by the petitioners and which the board evidently desired, he practically told the board to do as they pleased. Under such circumstances the board's deferring the matter over that meeting does not seem to us to signify refusal ; and, inasmuch as the board of aldermen was also the board of health, simply referring the communication to themselves in the latter capacity, it relating to a matter pertaining to health, does not afford, in our opinion, a conclusive inference

that the board had refused or would refuse, if requested, to execute a contract or license.

(2)    We observe that there seems to be some question in the minds of the parties as to whether the form of the document called for under said advertisement shall be a contract or an exclusive license.    We deem it not improper to say that we think, in view of the language of the rule of the board of health, and of the advertisement founded thereon, the proper form would be an exclusive license and not a contract.

For the reasons above given, there having been no demand and refusal, the petition must be denied.

*Hugh J. Carroll*, for petitioners.

· *Edward W. Blodgett, City Solicitor of Pawtucket*, for respondents.